UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No. 3:21-CR-64 JD

TONYA ROBINSON et al.

## OPINION AND ORDER

Now before the Court is the motion by defendant Albert Smith to grant a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 on Counts 8 and 9 of the Superseding Indictment. (DE 304.) Joined to this motion, but only seeking judgment as to Count 8, is defendant Tonya Robinson. For the following reasons this motion will be denied in part and taken under advisement in part.

### A. Background

The Court will briefly restate the general facts. Albert Smith and two of his codefendants, Tonya Robinson and Douglas Donley, were convicted following a jury trial of several counts alleging a public corruption scheme at the South Bend Housing Authority. Mr. Smith and Ms. Robinson were senior executives at the Housing Authority, Mr. Smith was the Asset Manager and Ms. Robinson was the Executive Director. Mr. Donley was a contractor who performed maintenance work for the Authority. Ms. Robinson and Mr. Smith operated a "hub and spoke" kickback scheme using their official positions at the Housing Authority. They would use their positions to authorize payment to certain contractors for maintenance work which was not actually performed. Those contractors would then cash the payment checks and return some of

that cash to Mr. Smith and Ms. Robinson. The contractors also engaged in some legitimate work for the Housing Authority.

The Government prosecuted this scheme by charging one count of conspiracy to commit bank or wire fraud (Count 1), several counts of bank fraud (Counts 2-7), and two counts of wire fraud (Counts 8 and 9) against all three of these defendants.[1] (DE 63.) Count 8 relates to a wire transmission on September 22, 2017, where the Housing Authority initiated and completed a "drawdown" of $80,000 from a United States Department of Housing and Urban Development ("HUD") account outside the State of Indiana. Count 9 relates to an August 22, 2018, cellphone communication between Albert Smith and contractor Latassia Burger which utilized a Sprint switch outside the State of Indiana.

At the close of the Government's case in chief, the three defendants moved for judgment of acquittal on Counts 8 and 9. *See* Fed. R. Crim. P. 29. The Court, as is its standard practice, reserved deciding the motion until after the jury returned a verdict, consistent with Rule 29(b). The jury returned verdicts of guilty on the conspiracy count and some of the bank fraud counts as to all defendants. As to Counts 8 and 9, Mr. Donley was found not guilty on both counts. Ms. Robinson was found guilty on Count 8 but not Count 9, and Mr. Smith was found guilty on both Count 8 and 9. Following the verdict, the motion for judgment of acquittal as to these counts was renewed by Mr. Smith and Ms. Robinson. Mr. Smith filed supplemental briefing on his motion and the Government has responded.[2] The motion is thus ripe for adjudication.

---

[1] There was also a count of federal program theft (Count 10) brought against Ms. Robinson and Mr. Smith. Both were convicted on this count.

[2] Ms. Robinson has not filed supplemental briefing to this motion, but based on her joinder at the end of trial the Court will consider her a party to Mr. Smith's motion.

**B. Legal Standard**

Federal Rule of Criminal Procedure 29(a) governs motions for judgment of acquittal. When a defendant moves for judgment of acquittal under Rule 29, a court must ask whether evidence exists from which any rational trier of fact could find the "essential elements" of the crime beyond a reasonable doubt. *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019). The movant faces a "nearly insurmountable hurdle" because the Court considers the evidence in the light most favorable to the Government and will grant the motion "only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Id.*; *United States v. Dewitt*, 943 F.3d 1092, 1096 (7th Cir. 2019) (citing *United States v. Blassingame*, 197 F.3d 271, 284 (7th Cir. 1999)) (internal quotations omitted). Thus, a Rule 29 motion is granted only if the record is devoid of evidence from which a jury could find guilt. *See United States v. Jackson*, 5 F.4th 676, 682–83 (7th Cir. 2021).

**C. Discussion**

As the Rule 29 inquiry turns on whether there is evidence of the essential elements of the charged crime, it is appropriate to begin with the elements of wire fraud. To establish wire fraud under 18 U.S.C. § 1343, the Government must prove (1) a defendant's participation in a scheme to defraud, (2) his or her intent to defraud, and (3) his or her use of interstate wires in furtherance of the fraud. *United States v. Sheneman*, 682 F.3d 623, 628 (7th Cir. 2012) (citing *United States v. Green*, 648 F.3d 569, 577–78 (7th Cir.2011)).

In this motion, only the third element is in contention as Mr. Smith disputes whether the Government has shown the use of wires was in furtherance of the scheme to defraud. As Mr. Smith does not dispute the Government introduced sufficient evidence of the other elements;

namely that he participated in a scheme to defraud, had intent to defraud, and the communications in question involved use of the interstate wires, the Court will not raise any such issues on his behalf and considers those questions waived.

### 1. The motion is denied as it relates to Count 8

The Court first turns to the arguments related to Count 8, based on the $80,000 drawdown from a HUD account on September 22, 2017.

Mr. Smith argues that the Government has failed to show that this wire transmission was in furtherance of the scheme. The argument he initially raised was that the Government failed to show any of the $80,000 in this drawdown went to pay for contractor work which was not performed. Mr. Smith expounds on this point by arguing that, because the contractors did some legitimate work for the Housing Authority and the Housing Authority used some of its funding on legitimate expenses, the Government must trace some of the money from this particular drawdown into a fraudulent transaction.

In his reply brief, Mr. Smith raises a second argument to counter a point in the Government's response. In their response, among other things, the Government argues that even if none of this particular drawdown went to contractors for work which was not performed, it still furthered the scheme in two ways. The first is by replenishing the pool from which the conspirators took money. The second was that a legitimate drawdown, for legitimate work in the midst of numerous fraudulent drawdowns for fraudulent work, acted to conceal the ongoing scheme by falsely portraying the legitimacy of the work being done at the Housing Authority. *See United States v. Fernandez*, 282 F.3d 500, 508 (7th Cir. 2002) (in context of mail fraud, mailings which falsely portray the legitimacy of the scheme are in furtherance of the scheme).

Mr. Smith's second argument, made in merely one sentence, is that the Government's concealment argument constitutes an improper amendment of the indictment.  Mr. Smith's argument must turn on a theory of impermissible constructive amendment of the indictment and relies on the fact the Superseding Indictment does not contain a specific allegation of "cover up, or any other explanation for how legitimate wires were used to advance the scheme [to defraud]." (DE 333 at 3.)

The Court will begin by addressing the argument alleging constructive amendment of the indictment.

### (a) There was no constructive amendment of the Superseding Indictment

The Court finds Mr. Smith's argument that the Government has attempted to amend the indictment lacks merit. To properly consider this question, it is useful to have some of the text of the Superseding Indictment at hand. The first paragraph is Paragraph 28, which introduces the alleged role of the drawdown transactions:

> "It was part of the scheme that the HASB–under TONYA ROBINSON's direction as Executive Director–made numerous "drawdown" requests to HUD, in which HUD funds were requested under certain HASB programs. When these "drawdown" requests were accepted by the U.S. Treasury, HUD funds were transferred from the U.S. Treasury to HASB Accounts at Bank A. These HUD funds were then moved to the HASB's operating account at Bank A and *were used, in part, to fund the fraudulent payment checks made out to the conspiring contractors*."

(DE 63 ¶ 28.) (emphasis added)

The next is Paragraph 45 which once again discusses the September 2017 transaction:

"In particular, on or about September 22, 2017, in the Northern District of Indiana and elsewhere, for the purpose of executing the scheme described above, TONYA ROBINSON, or an employee acting at her direction authorized a "drawdown" of HUD funds from the HASB's "Capital Fund Program" totaling $80,000, *which was used to fund fraudulent payment checks from the HASB's operating account*. This resulted in an interstate wire communication between Indiana and a HUD account located outside the State of Indiana."

(DE 63 ¶ 45.) (emphasis added)

Mr. Smith argues that because these paragraphs only allege use of the September 2017 drawdown to pay contractors, if the Government argues this transaction furthered the scheme in any other way than that is a constructive amendment of the indictment.

Constructive amendments and variances to an indictment can imperil a defendant's Fifth Amendment rights to be informed of the nature of the accusation against her and her Sixth Amendment right to indictment by a grand jury. *United States v. Ratliff-White*, 493 F.3d 812. 820 (7th Cir. 2007) (internal citations omitted). The distinction between a variance and a constructive amendment is essentially "between the situation in which different evidence supports the charged crime [as with a variance] and that in which the evidence supports a crime other than that charged [as with an amendment]." *Id.* at 820 (quoting *United States v. Pisello*, 877 F.2d 762, 765 (9th Cir. 1989) (other internal citations omitted)). Constructive amendment of the indictment is generally prohibited, but a variance is "fatal only when the defendant is prejudiced in his defense because he cannot anticipate from the indictment what evidence will be presented against him or is exposed to the risk of double jeopardy." *Id.* (internal quotations and citations omitted). A classic example of a constructive amendment is provided by *Stirone v. United States*, 361 U.S.

6

212, 215–16 (1960). In *Stirone* the defendant was indicted for obstructing interstate shipments of *sand*, but at trial the government proffered evidence he had obstructed *steel* shipments. The district court instructed the jury that it could convict based on *either sand or steel*. *Id.* The Supreme Court held this situation constituted an amendment of the indictment and reversed the conviction. *Id.*

Mr. Smith is incorrect that the alleged distinctions between the Superseding Indictment and the Government's argument can be considered constructive amendment. This is because the evidence that the drawdowns were used to conceal the scheme, as opposed to pay the schemers, still only supports the charged offense of wire fraud. It does not support a crime other than the one charged. As previously discussed, the element of wire fraud at issue is whether the defendant's use of interstate wires was "in furtherance of the fraud." *Sheneman*, 682 F.3d at 628. Concealing the scheme or enriching the schemers are both actions in furtherance of the fraud and therefore support the same essential element of the wire fraud charge.[3] *See United States v. McGowan*, 590 F.3d 446, 457 (7th Cir. 2009) (wire communications that make detection or apprehension less likely are in furtherance of the scheme to defraud) (collecting cases).

Nor can this distinction be considered a variance as the same evidence and act charged in the indictment were argued at trial. A variance is an occasion where different evidence supports the charged crime. *Ratliff-White*, 493 F.3d at 820. That is not the case here. The September 22, 2017 "drawdown," is what was charged in the Superseding Indictment, what was proffered to the jury, and what resulted in a conviction.  The crime charged and evidence are the exact same,

---

[3] The Court would again emphasize neither Mr. Smith nor Ms. Robinson have challenged the sufficiency of the evidence regarding the other elements of the wire fraud charge, nor alleged constructive amendment of the indictment as it relates to those elements.

even if the Government's description of how that evidence supports the charged crime is somewhat distinct.

The constructive amendment argument ultimately misses the forest for the trees. The indictment charged Ms. Robinson and Mr. Smith with engaging in a scheme to defraud the South Bend Housing Authority through their use of the interstate wires in September 2017. The evidence at trial was that the drawdown, over the interstate wires, in September 2017 occurred, and that it furthered their fraud against the Housing Authority. Further, Mr. Smith cites no legal authority whatsoever for the proposition that the Government's characterization of the evidence at trial is strictly limited to their characterization in the charging document.[4] Consequently, there is no distinction between what was presented in the Superseding Indictment and what was presented at trial which offends either defendants' rights under the Fifth or Sixth Amendment.

*(b) There was sufficient evidence for the jury to conclude that the drawdown was in furtherance of the scheme to defraud*

Having disposed of the constructive amendment argument, the Court now turns to whether there was sufficient evidence that the HUD drawdown was in furtherance of the scheme to defraud. The answer is yes for three reasons.

First, there is sufficient evidence of payments for work which wasn't done near the time of the drawdown for a jury to infer at least a portion of the drawdown was later used to enrich the schemers. As broader context, the jury, in finding the defendants guilty on Count 1 of the

---

[4] Mr. Smith's citation to *United States v. Swanquist*, 161 F.3d 1064, 1075–77 (7th Cir. 1998), to the extent it is on point, is actually adverse to his position. *Swanquist* involved a question of whether there was constructive amendment when the final jury instructions did not mirror the language of the indictment. The *Swanquist* court upheld a conviction and found there was no constructive amendment. *Id.* at 1076. His citation to *United States v. Jefferson*, 334 F.3d 670, 673 n.2 (7th Cir. 2003), is equally unavailing as it merely refers to *Stirone v. United States*, 361 U.S. 212, 215–16 (1960), providing a general explanation of what a constructive amendment is.

indictment, found that the evidence presented at trial showed that the defendants engaged in a conspiracy to commit bank and wire fraud beginning in at least July 2014 through September 2019. This places the September 2017 drawdown squarely in the middle of that ongoing scheme. There was also evidence that the Housing Authority's primary source of funding was from HUD, which constituted approximately $17 million each year. (DE 327 at 120:19–121:10.) The contractors involved in the conspiracy collectively received paychecks from the Housing Authority for approximately $6.8 million between 2014 and 2019. (Exh. 31.)  These facts broadly support an inference that HUD funds requested by the Authority during this time would be utilized by the scheme.

Additionally, there was evidence that the drawdown occurred shortly after bogus invoices were created and shortly before checks were issued to pay those invoices. One example involves the Housing Authority property at 413 S. Taylor. Housing Authority records indicate receiving an invoice from D Fresh Contractors, Doug Donley's business, dated August 31, 2017, for $12,500 worth of work performed on this unit including repairing ceilings and retiling the kitchen and bathroom. (Exh. 13 at 10.) On November 14, 2017, First Source Bank records indicate Doug Donley deposited a check for that amount and then withdrew $12,300 in cash. (*Id.* at 6–7.) At trial Ms. Juatuan Browne testified that she was living in the 413 S. Taylor property when those renovations supposedly occurred, but no such work was ever performed. (DE 328 at 68:20–69:20.) This evidence supports the inference that Mr. Smith and Ms. Robinson's scheme was creating a financial obligation on the Housing Authority in August 2017, the Housing Authority drew down HUD funds to cover this obligation in September 2017, and some of those drawn funds paid out the obligation in November 2017. The evidence further shows Mr. Smith and Ms. Robinson were familiar with the operations of the Housing Authority, including its

reliance on federal funds, such that they knew or could reasonably foresee their scheme would cause a wire transfer with HUD to occur.

It is possible to debate how to weigh this evidence and whether it was so strong that the inference *should* be made. But under Rule 29 it is not the Court's duty to reweigh evidence, rather it is to examine whether the record is "devoid of evidence" which supports the jury's conclusion. *Jackson*, 5 F.4th at 682–83.

The second reason for rejecting Mr. Smith's argument is that the Government is not obligated to trace a specific HUD dollar into the pocket of a defendant through a fraudulent invoice. Rather, it is enough to establish the "success of the scheme must in some measure depend on the mailing [or wire transmission]." *United States v. Powell*, 576 F.3d 482, 493 (7th Cir. 2009). Here, the success of the scheme plainly depends on use of wires to request additional funds from HUD. After all, in order for the scheme to successfully bilk the Housing Authority out of maintenance funds there needed to be sufficient funds available to the Housing Authority to pay the contractors. Former Executive Director of the Housing Authority, Katherine Lamberg, testified that the Authority's "primary funding" comes from HUD and that money is obtained through "drawdowns" requested over the interstate wires through the ELOCCS[5] system. (DE 327 at 120:16–25, 121:22–122:20.) Therefore, the scheme's success depended on periodic replenishment of the Housing Authority's maintenance fund, and a use of wires to drawdown HUD funds to replenish those coffers while the scheme was ongoing. *See Powell*, 576 F.3d at 493 (the filing of a lawsuit furthered the scheme to defraud by ensuring there was more money for the defendants to divide among themselves).

---

[5] Electronic Line of Credit Control System.

There is also a requirement that the defendant either caused the wire transmission to occur or at least acted with the knowledge that the use of a wire "would follow in the ordinary course of business or that such use could reasonably be foreseen." *United States v. Adcock*, 534 F.3d 635, 640 (7th Cir. 2008). *Adcock* is sufficiently analogous to govern this case and show that Mr. Smith and Ms. Robinson had sufficient knowledge to know or reasonably foresee their scheme would cause the wiring. In *Adcock* the defendant was the maintenance supervisor of a housing authority who, through his supervisory job responsibilities, knew that his housing authority received HUD funding and used that HUD funding to pay invoices. *Id.* at 640.

The same is true of Ms. Robinson and Mr. Smith. Ms. Robinson was the Executive Director of the Housing Authority responsible for day-to-day operations including submitting the annual budget and supervising the financial health of the agency. (DE 327 at 110:10–111:2, 112:13–113:3.) Mr. Smith served as Ms. Robinson's deputy with the title of Asset Director (DE 336 at 210:8–13). This role placed him in command of all the Housing Authority's property managers, overseeing all maintenance work done on properties, and ensuring such work was in accordance with the Housing Authority's budget. (DE 317 at 115:6–116:9.) This shows that it was reasonably foreseeable to Mr. Smith and Ms. Robinson that their fraud would result in the use of interstate wires and supports a conviction. Additionally, *Adcock* affirmed the conviction without requiring the specific tracing of funds between the victim and the perpetrators which Mr. Smith demands.

Mr. Smith stakes his position that the Government must trace specific dollars on the decision in *United States v. Jedynak*, 45 F. Supp. 3d 812 (N.D. Ill. 2014). However, this case is

inapposite.[6] While *Jedynak* is a wire fraud case, it involves distinct circumstances where the Government was prosecuting an individual for fraudulently recruiting investors by promising to utilize their money in one way but really using it in another. *Id.* at 815. The court in *Jedynak* ultimately granted the motion for judgment of acquittal on a particular count of wire fraud because the Government had failed to prove that each of the possible sources of funds involved in that count was a victim of the alleged fraud. *Id.* at 819, 820 ("In this case, whether the $100,000 in Count 3 is part of the fraudulent scheme is directly dependent on whether the funds could be tied to one or more defrauded investors."). This is a dispositive distinction from this case. No one is disputing that the source of the $80,000 drawdown was a victim of the fraud by Mr. Smith and Ms. Robinson.

Further, the portion of *Jedynak* which discusses how to deal with fraud cases involving comingled funds is simply not pertinent to this case. *See id.* at 820–21. The *Jedynak* Court expressly prefaced that discussion by noting there seemed to be no wire fraud cases that "address circumstances like these." *Id.* at 820. The circumstances were (1) "the only way that the $100,000 wire could be tied to the fraudulent scheme was by the Government showing that those funds came from money solicited from a defrauded investor" and (2) the source of the $100,000 was unclear given there was a pool of funds from five different investors including three individuals who's collective $125,000 investment was not clearly a result of fraud. *Id.* at 820. Neither of these distinct conditions is present here. The money wired from HUD clearly came from a victim of the scheme. This money could be tied to the fraudulent scheme either as money directly stolen by the scheme, money used to replenish the HASB coffers to allow future theft or

---

[6] To the extent *Adcock* is at odds with *Jedynak*, *Adcock* is controlling as it is binding precedent of the Seventh Circuit whereas *Jedynak* is merely persuasive precedent.

conceal prior theft or used to pay legitimate expenses and create the illusion of a properly functioning housing authority budget. Lastly, *Jedynak* does not establish any broader propositions of caselaw which are applicable here.

The Court would finally note what it finds to be the holding of *Jedynak*. *Jedynak* holds that while the ability to trace a specific dollar from a victim's pocket, through a given wire transaction, to the pocket of the defendant is sufficient to establish wire fraud, it does not hold that such a specific tracing is always required. Rather, it was required on the specific facts of that case due to a lack of other viable theories. It would be contrary to Circuit precedent to impose such a tracing requirement on every wire transaction given the test laid out by the Seventh Circuit is not "did the wire transfer move a specific dollar or asset from the victim's pocket to the perpetrator's pocket?" Rather, the question is does the success of the scheme "in some measure depend on the mailing [or wire transmission][?]" *Powell*, 576 F.3d at 493; *see also Sheneman*, 682 F.3d at 629–30 ("even a routine or innocent use of the wires may satisfy this element so long as that use is part of the execution of the scheme").

The third and final reason this argument fails is the Government's argument that even if this particular drawdown did not directly pay contractor checks for unperformed work, performing some legitimate transactions in the midst of a series of fraudulent transactions furthered the scheme by making it appear as if the Housing Authority was running properly. *Sheneman*, 682 F.3d at 629–30 ("even a routine or innocent use of the wires may satisfy this element so long as that use is part of the execution of the scheme") (citing *United States v. Turner*, 551 F.3d 657, 666 (7th Cir. 2008)); s*ee also Fernandez*, 282 F.3d at 508 (in context of mail fraud, mailings which falsely portray the legitimacy of the scheme are in furtherance of the

scheme). Mr. Smith's only response to this argument is that it was a constructive amendment of the Superseding Indictment, which the Court has previously dismissed.

For these reasons, the motion for a judgment of acquittal on Count 8 will be denied.

### 2. The motion is taken under advisement as it relates to Count 9

The Court will next address the Rule 29 motion as it relates to Count 9. Again, Count 9 is the wire fraud charge predicated on the August 22, 2018, cell phone communication between Mr. Smith and Ms. Burger. Ms. Burger was one of the contractors who received payments for work which was not performed and delivered a portion of those payments to Mr. Smith. Ms. Burger was not charged in this case and testified during the Government's case in chief. To help contextualize the communication, a brief recap of Ms. Burger's testimony is in order.[7]

Ms. Burger testified she started her contracting business, "Tea's Maintenance" at the suggestion of Mr. Smith. (DE 331 44:11–45:12.) She testified that she only performed certain types of work for the Housing Authority, principally painting housing units when they were vacant between tenancies. (*Id.* at 45:13–46:16.) Further, she did not perform work while tenants were still residing in the units, she did not install carpet, nor did she retile bathrooms. (*Id.* at 46:17–23.) This was contrary to invoices produced at trial from Tea's Maintenance to the Housing Authority for such work. (*See e.g.*, Exh. 36.)

Ms. Burger further testified that "most of the time or practically all of the time" when she would receive a check from the Housing Authority she would cash the check at First Source

---

[7] There was other evidence introduced at trial which corroborates much of Ms. Burger's testimony and corroborates Mr. Smith's practice of using cellphone communications to notify contractors to pick up their checks and return the kickback. As Mr. Smith does not dispute the existence of the scheme in this motion, for the sake of brevity the Court will focus on Ms. Burger's testimony as the most illustrative evidence of how the August 22, 2018, communication was in furtherance of the scheme to defraud.

Bank, withdraw cash from that check, and then deliver that cash to Albert Smith. (*Id.* at 48:14–49:10.) Crucially, Ms. Burger testified that Mr. Smith would call or text her to let her know when there was a check to be collected. (*Id.* at 49:21–50:5.) Ms. Burger also testified that on at least three occasions, while at the bank she called Mr. Smith because the check was not being processed. (*Id.* at 54:16–18.) In those instances, Mr. Smith would instruct her that he needed to "push a button" on his end, and then a few minutes later the check was able to be processed by the bank. (*Id.* at 54:19–55:7.)

Ms. Burger also testified that she would not prepare her own paperwork, such as invoices recording work she had done at the Housing Authority, and Mr. Smith prepared them for her. (*Id.* at 52:4–11.) Nor did she track the jobs she was doing for the Housing Authority, nor did she keep track of the money she thought she was owed by the Housing Authority. (*Id.* at 53:12–21.) Instead, Mr. Smith kept track for her. (*Id.* at 22–25.)

As it relates to the August 22, 2018, wire communication, Ms. Burger testified that on that day she had a Housing Authority check, cashed it at the bank, and delivered a portion of the cash to Mr. Smith. (*Id.* at 55:8–56:11; Exh. 3C-15 (check in question)). Ms. Burger testified that she would have called or texted with Mr. Smith on that day. (*Id.* at 56:12–14.)

Mr. Smith argues that the Government did not introduce evidence that the telephone communication on August 22, 2018, was part of the scheme "in any way." (DE 304 at 4.) In particular, Mr. Smith argues that the Government did not show that this phone call resulted in funds being "pulled down," nor that any "pulled down funds" were used to pay for work which was not done.[8] This latter argument is parallel to Mr. Smith's argument regarding Count 8, that

---

[8] The Court interprets Mr. Smith's use of the phrase "pulled down" or "drawdown" to refer to the specific process of the Housing Authority drawing on its HUD accounts to replenish its local bank accounts. Obviously, a contractor's act of depositing or cashing a payment check from the Housing Authority would always cause a

the Government has an obligation to trace the flow of specific funds from a victim and show they were expropriated by the scheme. The Court has already addressed this argument in resolving the motion as to Count 8 and explained why it fails.  The Court would additionally note that resolving the "drawdown" argument is unnecessary to resolve Count 9 as the basis of that count is the use of interstate wires via cellphone communications, not the interstate wire of funds.

Nonetheless, the Government must still show that the telephone communication on August 22, 2018, furthered the scheme to defraud.  Here, the cellphone communications could further *a crime.* Communications made to conduct the business of a criminal scheme, such as issuing instructions, are in furtherance of the scheme.  *See, e.g., United State v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991) (statements to conduct or help conduct the business of the scheme are in furtherance of a conspiracy). As discussed above, the evidence allows a reasonable inference that the wire communication on August 22nd was consistent with other communications and could further the scheme by coordinating the manner of payment.  What appears lacking at this point is evidence to support a reasonable inference that the August 22, 2018, payment was for work not performed.

The Court is obligated to order additional briefing on this question and will take the motion as it relates to Count 9 under advisement. At trial the Government introduced evidence of a general pattern of fraud involving fraudulent invoices, paychecks, and wire communications between Ms. Burger and Mr. Smith. Further, the Government has shown evidence that on August 22, 2018, Ms. Burger received a check from the Housing Authority, cashed it at the bank, and returned a portion of the check in cash to Mr. Smith pursuant to Mr. Smith's instructions over the phone. This was all readily discerned from the record.

---

drawdown, in a more general sense, as money in the Housing Authority bank accounts would be transferred to the contractor by payment of the check.

However, in its response to the Rule 29 motion the Government has not identified evidence showing any of the money being dispersed by the August 22 check was for work which was not performed at the Housing Authority. I.e. the Government has not identified any evidence showing this particular check was part of the fraudulent scheme as opposed to payment for legitimate work performed. While communications made to conduct the business of a criminal scheme, such as issuing instructions, are in furtherance of the scheme, the communications must still be related to the scheme. *See Cox*, 923 F.2d at 527 (statements to conduct or help conduct the business of the scheme are in furtherance of a conspiracy).

The Court's own review of the record has failed to identify any such evidence among the voluminous financial and business records. Consequently, the Court will take the motion under advisement and order the Government to file supplemental briefing identifying such evidence in the trial record.

The Court will briefly discuss why the record evidence it reviewed is insufficient to resolve this issue. As previously discussed, Ms. Burger received paychecks for legitimate work, that she actually performed for the Housing Authority, as well as work for which was not performed as a part of the scheme. Ms. Burger testified she did not keep track of the work she performed and what payment she was entitled. She did not testify whether the check she was depositing on August 22 was for work she knew she performed or not. Moreover, she testified that most of the time or practically all the time she received a check from the Housing Authority she would bring a portion in cash to Mr. Smith. Given these other facts, that Ms. Burger returned a portion of the August 22, 2018, check to Mr. Smith is not particularly probative of whether it was funds obtained from the scheme or legitimate payment for work she performed.

17

The Court would further note that the Government identified the specific check Ms. Burger deposited on August 22, 2018, as Check Number 127513 in the amount of $12,500. The Government however has not identified any other evidence indicating what invoice or purported work it is connected to. For example, they have not even paired this check with an invoice reflecting it was to pay for a type of work which Ms. Burger testified she never performed.

Thus, the motion for a judgment of acquittal on Count 9 will be taken under advisement pending further briefing.

### D. Conclusion

Accordingly, the motion for a judgment of acquittal on Count 8 for defendant Albert Smith and Tonya Robinson, is DENIED. The motion for a judgment of acquittal on Count 9 for defendant Albert Smith is TAKEN UNDER ADVISEMENT. The Government is to file a supplemental brief within fourteen (14) days of this order identifying what evidence connects the check deposited by Ms. Burger on August 22, 2018, with the scheme to defraud charged in the Superseding Indictment.

SO ORDERED.

ENTERED: February 2, 2024

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court