UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

UNITED STATES OF AMERICA

v.                                    Case No. 3:21-CR-64 JD

TONYA ROBINSON et al.

**OPINION AND ORDER**

The defendant, Tonya Robinson, was convicted at a jury trial of nine counts[1] relating to a conspiracy she and her co-conspirators orchestrated to defraud the Housing Authority of South Bend. Following Ms. Robinson's conviction, the Probation Office prepared a Presentence Investigation Report ("PSR") to aid the Court in sentencing. Ms. Robinson has filed several objections to the PSR. The briefing on the objections is complete and they are ripe for adjudication. For the following reasons the Court will sustain in part and deny in part the objections.

**A. Background**

The Court has previously described the circumstances of this case in greater detail, but will provide an overview. Ms. Robinson was formerly the Executive Director of the Housing Authority of South Bend ("HASB"). Over the course of several years she conspired with another HASB official, and codefendant, Albert Smith to operate a "hub and spoke" fraud scheme using their official authority. HASB relied on both maintenance employees and independent

---

[1] One count (Count 1) of conspiracy to commit bank and wire fraud in violation of 18 U.S.C. § 1349, six counts (Counts 2–7) of bank fraud in violation of 18 U.S.C. § 1349, one count (Count 8) of wire fraud in violation of 18 U.S.C. § 1343, and one count (Count 10) of federal program theft in violation of 18 U.S.C. § 666(a)(1)(A).

contractors to maintain the public housing properties it owned. Ms. Robinson and Mr. Smith would issue fraudulent payments to co-conspirator maintenance contractors, the spokes, and the contractors would then return a portion of those checks in cash to them, the hub. The payments were fraudulent as they were issued for work which was not actually performed. The four contractor co-conspirators were Archie Robinson III, Ronald Taylor, Doug Donley, and Latassia Burger.[2] With the exception of co-conspirator Doug Donley, all the contractors also performed some legitimate work for the HASB. As part of this scheme Ms. Robinson and Mr. Smith fabricated false HASB documents to make it appear as though the stolen money was being appropriately spent on maintenance, including falsified invoices.

### B. Discussion

The Court will address each of Ms. Robinson's objections in turn.

### (1) Loss Amount (Paragraphs 23, 29, 41)

Ms. Robinson objects to the proposed loss amount contained in the PSR; for the following reasons that objection will be sustained.

Section 2B1.1(b)(1) of the Sentencing Guidelines provides that if the loss from an offense involving fraud or deceit exceeds $6,500, then there will be an increase to the offense level calculation based on the amount of loss. U.S.S.G. § 2B1.1(b)(1). The appropriate increase is reflected in a corresponding table. *Id.* The Government bears the burden, under the preponderance of the evidence standard, to establish a loss amount. *United States v. Hogge*, No.

---

[2] A few points of clarification are helpful: Archie Robinson is unrelated to Tonya Robinson, Latassia Burger is an unindicted co-conspirator, and except for Doug Donley all the contractors testified at trial as Government witnesses.

2:07-cr-46, 2011 WL 1158442, at *4 (N.D. Ind. Mar. 29, 2011) (citing *United States v. Vivit*, 214 F.3d 908, 916 (7th Cir. 2000)). The commentary to the Guidelines outlines two ways in which loss can be calculated; "actual loss" and "intended loss." Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1(b)(1) n.3(A)(i). Intended loss "(I) means the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." U.S.S.G. § 2B1.1(b)(1) n.3(A)(ii). Both parties here propose actual loss amounts tied to the amount of money which was actually paid to the contractors.

The Court is only obligated to make a "reasonable estimate" of the financial loss based upon the available evidence. U.S.S.G. § 2B1.1 n.3(C).[3] However, determining whether or not a loss was reasonably foreseeable requires the Court to perform causation analysis and conclude the defendant was both the but for and proximate cause. *United States v. Domnenko*, 763 F.3d 768, 777 (7th Cir. 2014) (determining whether a loss was reasonably foreseeable requires causation analysis); *United States v. Whiting*, 471 F.3d 792, 802 (7th Cir. 2006) (the causation analysis includes but for and proximate causation inquiries). Furthermore, the reasonable estimate must be based on reliable and specific evidence. *Hogge*, 2011 WL 1158442, at *8; *see also United States v. White*, 639 F.3d 331, 339 (7th Cir. 2011) (while the Federal Rules of Evidence do not apply at sentencing hearings, the district court must ensure evidence used is reasonably reliable).

---

[3] The Guidelines commentary also provides a list of factors a court should consider in making its estimate. *Id.* at n.3(C)(i)–(vi). However, none of these factors are applicable to the circumstances of this case.

The PSR proposes a loss amount of $4,007,499.87. (DE 362 ¶ 23.) This amount reflects one hundred percent of the cash withdrawn by co-conspirators Ronald Taylor, Archie Robinson III, and Latassia Burger on the same day they deposited a paycheck from the HASB. This amount also includes one hundred percent of the HASB payments to co-conspirator Doug Donley. This proposed loss amount results in an increase of eighteen offense levels as it is a loss amount greater than $3,500,000 but less than $9,500,000. U.S.S.G. § 2B1.1(b)(1)(J). The Government acknowledges that while most of the contractors performed some legitimate work for the HASB, there are no clear records or witness recollections of how their total proceeds from the HASB were divided; how much was for legitimate work actually performed. In total there was $6,894,190.87 in HASB checks issued to Archie Robinson, Ronald Taylor, Latassia Burger, and Doug Donley. The Government suggests that the entirety of the cash withdrawals made on days a contractor deposited an HASB check is a reasonable approximation of the amount taken by fraud. This is because the contractors testified they would withdraw cash from the deposit of a bogus paycheck on the same day as the deposit and then return that cash as a kickback to Ms. Robinson or Mr. Smith. The Government's method also counts one hundred percent of the HASB payments made to Doug Donley based on the fact he never performed any legitimate work for the HASB.

Ms. Robinson objects to this proposed loss amount and suggests an alternative loss amount of $2,944,228.35. This alternative loss amount would result in an increase of sixteen levels as it is greater than $1,500,000 but less than $3,500,00. U.S.S.G. § 2B1.1(b)(1)(I). Ms. Robinson argues this number is more appropriate as it accounts for the co-conspirators' testimony at trial that they received more money from legitimate work than from fraud and they used some of their cash withdrawals to cover legitimate operating expenses. In Ms. Robinson's

view this means that a majority of the HASB money received by the contractors, including the cash withdrawn on the same day that a check was deposited, should be presumed to be legitimate. Ms. Robinson thus proposes that after considering all the money paid to the contractors, again $6,894,190.87, something less than half of this amount should be designated as the loss.

Ms. Robinson proposes the ratio should be sixty-forty, with forty percent of the total compensation to Archie Robinson, Ronald Taylor and Latassia Burger from the HASB being considered loss. Ms. Robinson concedes the entire amount of HASB money paid to Doug Donley should be considered loss as he did not perform any legitimate work for the HASB.

The question for the Court then is which of these competing methodologies results in the most reasonable estimate of a loss amount due to fraud. Given none of the contractors kept detailed records of their transactions, nor recalled the specific breakdown in their income between legitimate and illegitimate payments, the Court is required to conduct a reasonable estimate. The contractors, other than Donley, did in fact testify they made more money from HASB through legitimate work than fraud. (DE 330 at 188:4–17 (Archie Robinson testimony), 226:11–19 (Taylor testimony); DE 331 at 73:13–16 (Burger testimony).) They also testified to sometimes using cash to pay off expenses for their legitimate work. (DE 330 at 188:23–25 & 194:17–20 (Archie Robinson testimony), 219:25–220:1 & 226:23–227:9 (Taylor testimony); DE 331 at 72:14–20 (Burger testimony).) However, Ms. Burger's testimony made a distinction between two different cash streams. While she testified that she would pay employees in cash, she also testified she was not doing so on the same day she was cashing checks from the HASB. (DE 331 at 72:14–20.)

Having considered the trial record and the arguments presented, the Court will partially sustain Ms. Robinson's objection. The objection is sustained as it relates to the loss amount tied to Mr. Robinson and Mr. Taylor. The Court reaches this conclusion because it is unclear from the record whether some of the cash withdrawn on the same day that a HASB check was deposited went toward paying legitimate costs or went entirely to enriching Ms. Robinson and Mr. Smith. The testimony of Mr. Robinson and Mr. Taylor is relatively generic about their different cash streams which renders the Court unable to accept the Government's inference that each dollar of a cash withdrawal made on the same day that a HASB check was cashed necessarily constitutes an illegitimate payment.[4]

In light of this uncertainty from the trial record, the Court concludes the most reasonable assessment requires designating less than half of the total compensation received as loss. The Court recognizes that this is an imperfect assessment but concludes, based upon the evidence at trial, it is a more reasonable assessment than that proposed by the Government. The Court ultimately adopts Ms. Robinson's approach for Mr. Robinson and Mr. Taylor as it more closely adheres to their testimony. The Court is not persuaded by the Government's argument that because its methodology was adopted for the loss calculation during Mr. Taylor and Mr. Robinson's sentencing, it should be adopted here. There was no dispute about the loss amount in those sentencings and consequently the Court had no occasion to test whether the Government had satisfied its burden of proof.

---

[4] The Court would emphasize there is no basis to question that at least *some* of the cash withdrawn on the same day was used to pay the kickbacks. Consequently, there is no basis to question whether the elements of the conspiracy as alleged by the Government were proven at trial. Instead, the Court is concerned with the narrower question of whether the evidence establishes that *all* the cash withdrawn on the same day as a check deposit went towards paying kickbacks.

The objection is overruled as it relates to the loss amount tied to Ms. Burger because her testimony is more precise on the nature of her business' cash flow. Ms. Burger clearly testified that she did not use cash withdrawn on the same day that a HASB check was deposited to pay legitimate expenses, rather it went solely to enrich Mr. Smith and Ms. Robinson. Ms. Burger's testimony offers the requisite additional detail about her cash management to sustain the Government's proposed inference that if cash were withdrawn on the day of a deposit, it went exclusively towards paying kickbacks to Albert Smith and Tonya Robinson. Regardless, even if the Court used the same loss analysis for Ms. Burger as it did for Mr. Robinson and Mr. Taylor, it would not impact the offense level increase under §2B1.1(b)(1).

In light of these rulings, the final loss amount will be calculated as follows. Mr. Robinson collected a total of $3,292,207.43 in HASB checks. (Gov't Exh. 27.) Forty percent of this amount is $1,316,882.97. Mr. Taylor collected a total of $1,915,817.50. (Gov't Exh. 28.) Forty percent of this amount is $766,327. These numbers are then added with the total same day cash withdrawals of Ms. Burger, $849,820, and the total amount of HASB funds paid to Mr. Donley, $303,920.[5] This results in a total loss amount of $3,236,949.97, slightly higher than that proposed by Ms. Robinson, and an increase of sixteen offense levels. U.S.S.G. § 2B1.1(b)(1)(I).

### (2) Sophisticated Means Enhancement (Paragraphs 30 and 42)

Next, the Court turns to Ms. Robinsons' objection to paragraphs 30 and 43 of the PSR. These paragraphs apply a two-level enhancement based on Ms. Robinson utilizing sophisticated means during the course of her fraud.

---

[5] This amount is in accord with the Court's ruling on Mr. Donley's objections to his PSR. (DE 380 at 6.)

This provision states that if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase by 2 levels." U.S.S.G. § 2B1.1(b)(10)(C). The commentary to the Sentencing Guidelines describes sophisticated means as:

> "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."

U.S.S.G. § 2B1.1 n. 9.

The Seventh Circuit has instructed that this enhancement is properly applied "when the conduct shows a greater level of planning or concealment than a typical fraud of its kind." *United States v. Green*, 648 F.3d 569, 576 (7th Cir. 2011) (internal quotations and citations omitted). The Seventh Circuit has also stated that the enhancement is proper when "the offense conduct, viewed as a whole, was notably more intricate than that of the garden-variety [offense]." *United States v. Knox*, 624 F.3d 865, 870–71 (7th Cir. 2010) (quoting *United States v. Jenkins*, 578 F.3d 745, 751 (8th Cir. 2009)). Further, the Seventh Circuit has held that Section 2B1.1(b)(10)(C)'s use of the phrase "intentionally engaged in or caused the conduct constituting sophisticated means" clarifies that this enhancement should be based on the individual

defendant's conduct rather than on the basis of the sophistication of the overall scheme alone. *United States v. Griffin*, 76 F.4th 724, 751 (7th Cir. 2023) (internal citations omitted).[6]

Ms. Robinson argues this enhancement is inappropriate because her fraud utilized simple mechanisms and endured for several years because of its simplicity. Specifically, contractors agreed to accept HASB paychecks issued for invoices describing work which never occurred. The contractors then cashed or deposited the checks, withheld a portion of the funds and returned the remainder as a kickback to Ms. Robinson and Mr. Smith. Ms. Robinson acknowledges that a large number of false documents were created to further and conceal the scheme, but notes they were created using a basic word processing software and did not require any specialized knowledge. She further argues, the large volume does not represent sophistication of her scheme, but rather its volume of activity, and an enhancement for the volume is already reflected in her loss amount enhancement. Ms. Robinson also notes that while one or more co-conspirators created the fictious business enterprise "D Fresh" to receive HASB payments, and creation of fictious entities usually supports applying the enhancement, there is no evidence that she was personally involved in creating the enterprise. Lastly, Ms. Robinson notes that the enhancement was not applied to any of the codefendants who have been previously sentenced and argues that subjecting her to the enhancement would consequently create an inappropriate sentencing disparity.

The Government disagrees, arguing that the volume of falsified documents produced in the course of this long running fraud, as well as Ms. Robinson's lies to the officials overseeing

---

[6] Under a prior version of the Guidelines, which was applicable in *Green*, the enhancement could be applied to a defendant in a conspiracy so long as the use of sophisticated means by her co-conspirators was reasonably foreseeable to her. *Green*, 648 F.3d at 567. A 2015 Amendment to the Guidelines changed the language to require that the defendant's own intentional action or direction caused the conduct constituting sophisticated means. *See Griffin*, 76 F.4th at 752.

the Housing Authority, constitute sophisticated means. The Government also notes that Ms. Robinson directed her Housing Authority subordinates, who were otherwise uninvolved in the conspiracy, to approve the false paperwork she and her coconspirators produced. Lastly, they argue, Ms. Robinson approved some of the documents herself.

The Court will sustain the objection. As an initial matter, the Government has not proffered any evidence that Ms. Robinson was involved in, or even aware of, the decision to create the fictious "D Fresh" business enterprise. This precludes the Court from finding that it was the result of her intentional conduct. *See Griffin*, 76 F.4th at 751.

Next, the involvement of Ms. Robinson, when viewed as a whole did not involve a greater level of planning or concealment than a typical fraud of its kind. The evidence supports that Ms. Robinson created some false invoices[7] in the course of the scheme (DE 330 at 176:12–19 (testimony of Archie Robinson that Ms. Robinson created false invoices)), she personally approved or directed employees to approve falsified paperwork (*see e.g.*, DE 331 at 19:3–8 (testimony of Debbie Clark that she was instructed by Tonya Robinson to sign documents)), and she lied to the HASB Board of Commissioners[8] about the issues in the Authority's finances (DE 328 at 132: 10–20) and about why federal officers had searched the HASB headquarters (*Id.* at 133:14–134:8). But every fraud crime involves some degree of deception or dishonesty, that is what fraud is. The Court is not persuaded that Ms. Robinson's established conduct rises to the level of sophisticated means.

---

[7] While the trial record suggests other false documents, such as bids for phony work or scopes of work, were created the Government has not shown Ms. Robinson was directly involved in their creation.

[8] The Board of Commissioners is the seven-member body which makes general policy decisions and directs and supervises the work of the Housing Authority. The members are appointed by the Mayor of South Bend. The Board is not involved in the day-to-day management of the Authority as that duty is left to the Executive Director and her staff.

The large volume of falsified records created is a factor which marginally weighs in favor of the enhancement. But the Court does not find that this factor alone is sufficient to apply the enhancement. If a long duration of the scheme and repetition of the same fraudulent acts were sufficient to qualify as sophisticated means, then virtually every fraud offense over an extended period would become "sophisticated." This view of the enhancement is at odds with the Circuit precedent instructing it should be applied to actions distinct from "typical fraud of its kind." *Green*, 648 F.3d at 576. The key inquiry is about the nature of the activity and not necessarily the duration or volume. Again, that is not to say duration and volume of fraudulent acts are irrelevant in determining sophisticated means. The limited point the Court is making is that those conditions *alone* will not ordinarily merit the enhancement. Moreover, there is little evidence that Ms. Robinson was engaged in the preparation of false invoices for a sustained period of time.

As well, here, the fraudulent documents at issue are not particularly complex. Mr. Smith or Ms. Robinson used basic word processing software to convert templates of existing invoices submitted by the contractors for legitimate work into the false invoices. (*See* DE 330 at 162:18–163:4 (Archie Robinson's testimony on how he prepared his invoices; DE 332 at 112:12–18 (Steve Peterson's testimony on how it was easy to amend or create invoices for Archie Robinson's company.) Further, the documents often used boilerplate phrase such as "[work] completed per scope" to describe the work which had been allegedly performed. (*See e.g.,* Exh. 11 at 14 (Archie Robinson invoice), Exh. 37 at 11 (Taylor invoice), 20 (Burger invoice)). Therefore, the nature of these documents does not provide much support to the Government's position, unlike a more complicated type or set of documents. Also, some amount of falsified documentation was essential to this offense. If Ms. Robinson and Mr. Smith merely wrote checks

from the HASB accounts without any documented record, they would be nakedly stealing money from the Housing Authority. As such, the mere fact there was some falsified documentation does not make it a plot utilizing sophisticated means. *See United States v. Friedman*, 971 F.3d 700, 717 (7th Cir. 2020) (affirming the application of the sophisticated means enhancement, in part, because the falsified documents contained more than "the most basic lies."). And again, the evidence that Ms. Robinson prepared false documents seems especially limited.

Similarly, the fact Ms. Robinson lied to the Board of Commissioners does not push her conduct over the line into sophisticated means. The trial record indicates she lied by claiming there were problems responsible for the Housing Authority's poor finances other than those associated with her fraudulent activities, and that she didn't know why federal agents raided the HASB headquarters when in reality she was aware they were investigating her fraud. These are not particularly complex or innovative lies. The Government has not provided any caselaw that merely feigning ignorance or attempting to deflect blame is sufficient to rise to the level of sophisticated means. The fact Ms. Robinson either personally signed off on falsified documents or directed employees to do so is also unavailing. That Ms. Robinson approved documentation she knew to be fraudulent or directed employees to approve fraudulent documents is not by itself sophisticated. Rather, it is simply another form of lying to potential observers about the legitimacy of the false documents and the operations of the Housing Authority.

Ms. Robinson's intentional actions in operating the means of the scheme can be summarized as falsifying some invoices, pushing the invoices through the approval process (by personally signing or directing subordinates to sign), issuing the checks to pay the invoices (sometimes signing her approval on the check sheets), and then accepting her kickback. These acts certainly amount to fraud, but do not rise to the level of sophisticated means. There is

nothing about her individual conduct which makes her actions more complex or intricate than a typical fraud of its kind. Any kickback scheme predicated on payment for work not actually performed, in a workplace where written authorization is required for payment, would require the completion of these steps.

Moreover, the Government has not offered any caselaw in support of their position that sheer volume and duration of a fraud scheme using a simple mechanism will make an activity sophisticated means. The Court recognizes that there is Circuit precedent holding that individual, unsophisticated, actions can collectively amount to a scheme which is considered sophisticated means. *See e.g. United States v. Redman*, 887 F.3d 789, 792–93 (7th Cir. 2018) (affirming application of sophisticated means enhancement where defendant "caused the creation of a substantial amount of paperwork, including fake diplomas, fake resumes, and fake unauthorized licenses and made government filings in order to further and conceal his elaborate scheme.")

There is, however, a distinction between continuous repetition of a simple but effective fraud and coordinating a series of individually simple actions into a more elaborate scheme. Playing the same song on an individual violin over and over again does not create a symphony. *See Griffin*, 76 F.4th at 752 (affirming the district court's conclusion that the defendant's conduct, when evaluated as a whole, constituted sophisticated means even if some individual acts were not sophisticated).

Consequently, as the Government has not shown any of Ms. Robinson's intentional acts are individually, or taken as a whole in the context of the overall scheme, constitute sophisticated means the Court will sustain Ms. Robinson's objection to the proposed enhancement.[9]

---

[9] The Court finds it unnecessary to reach Ms. Robinson's sentencing disparity arguments given it has sustained her objection on alternate grounds.

### (3) Organizer/Leader Enhancement (Paragraphs 32 and 45)

Lastly, Ms. Robinson objects to Paragraphs 32 and 45 of the PSR. These paragraphs

apply a four-level enhancement for her role as an organizer or leader of criminal activity

involving five or more participants. U.S.S.G. § 3B1.1(a). The commentary to the Sentencing

Guidelines provides a non-exhaustive list of factors the Court should consider in determining

whether a participant is an organizer or leader:

> Factors the court should consider include the exercise of decision making authority, the
> nature of participation in the commission of the offense, the recruitment of accomplices,
> the claimed right to a larger share of the fruits of the crime, the degree of participation in
> planning or organizing the offense, the nature and scope of the illegal activity, and the
> degree of control and authority exercised over others. There can, of course, be more than
> one person who qualifies as a leader or organizer of a criminal association or conspiracy.
> This adjustment does not apply to a defendant who merely suggests committing the
> offense.
>
> U.S.S.G. § 3B1.1 n.4.

The Seventh Circuit has provided further commentary on this enhancement, instructing

lower courts to consider the factors provided in the Guidelines but recognizing the "primary goal

in applying § 3B1.1 should be to make a 'commonsense judgment about the defendant's relative

culpability given [the defendant's] status in the criminal hierarchy.'" *United States v. House*, 883

F.3d 720, 724 (7th Cir. 2018) (quoting *United States v. Dade*, 787 F.3d 1165, 1167 (7th Cir.

2015)). For purposes of this enhancement, a defendant "exercises control and authority over

another when [the defendant] 'tells people what to do and determines whether they've done it.'"

*United States v. Weaver*, 716 F.3d 439, 443 (7th Cir. 2013) (quoting *United States v. Figueroa*, 682 F.3d 694, 697 (7th Cir. 2012)).

Ms. Robinson argues this enhancement is not supported by the record because there is no evidence that she was involved in developing the scheme, recruiting any of the contractors, collecting money, or managing criminal activity of co-conspirators. She further argues that her role as Executive Director of the Housing Authority does not automatically make her the leader or organizer of a criminal conspiracy within the Housing Authority.

Ms. Robinson's objection will be overruled for three reasons. The first is that she repeatedly issued instructions on executing the conspiracy to at least one of her co-conspirators. Archie Robinson testified that as part of his work for the Housing Authority, he would have many meetings with Ms. Robinson. (DE 330 at 173:19–23.) Further, on twenty or more occasions during those meetings, Ms. Robinson would issue him an instruction to pick up an illegitimate check from Mr. Smith. (*Id.* at 174:2–22, 175:3–4.) Issuing instructions for a co-conspirator to act in furtherance of the conspiracy is an exercise of control over a co-conspirator and unambiguously shows the speaker was acting in a leadership role. *See* U.S.S.G. § 3B1.1 n.4; *Weaver*, 716 F.3d at 443 (a defendant exercises control over another when they tell them what to do and determines whether they've done it).

Second, once Albert Smith left the Housing Authority Ms. Robinson was the only remaining "hub" participant and inherently became the leader of the conspiracy. An essential feature of the conspiracy was that there would be "hub" participants who could use their official authority at the HASB to issue fraudulent paychecks to the contractors. Upon Mr. Smith's departure, Ms. Robinson was the only person remaining in that role and thus the conspiracy could not continue to function without her direction, approval, and use of her official authority.

15

In fact, during one of her meetings with Archie Robinson after Mr. Smith left, Ms. Robinson told him that they would continue the criminal enterprise. (*Id.* at 175:19–25.) Ms. Robinson also prepared some of the fraudulent invoices to conceal the theft and took a larger portion, one half instead of one third, of the pilfered money. (*Id.* at 176:12–19.) Ms. Robinson would then directly receive that money. Archie Robinson testified that she would either open a desk drawer and have him drop the money in the drawer, or put it in her car, or deliver it to her after work outside of the Housing Authority office. (*Id.* at 176:20–25.)

Ms. Robinson attempts to sidestep this fact by saying she only filled the role for a short period of time near the end of the conspiracy. The length of her tenure as the sole leader is inconsequential here. While the enhancement does require "ongoing supervision," i.e. something more than a one-off request between peers in the criminal scheme, it does not require a defendant to spend a certain time in leadership or make a certain number of leadership level decisions to qualify.[10] *United States v. Owens*, No. 2:18-CR-101-2, 2020 WL 859398, *4 (N.D. Ind. Feb. 20, 2020) (internal citations omitted). In this case Albert Smith left the Housing Authority, at the latest, in March 2019, and the conspiracy continued until investigators executed a search warrant on the Housing Authority headquarters on July 31, 2019. So at a minimum, Ms. Robinson was directing the conspiracy for four months. What ultimately matters here is that during her several months as the sole "hub" participant in the criminal conspiracy Ms. Robinson made key decisions, issued instructions, and generally directed the continuation of the conspiracy. Ms. Robinson made the ultimate decision to continue the scheme once Mr. Smith left, issued

---

[10] The Court would take care to note that while a defendant's time in a leadership position is a factor to be considered, it is not dispositive, and a short tenure does not inherently insulate a defendant from the enhancement. What the defendant decides to do with what time they are given in leadership may be an equally, or more important, consideration depending on the facts of their case.

directives for Archie Robinson to fulfill his role in the scheme, took over Mr. Smith's role of preparing false paperwork to further the scheme, and directly collected the proceeds.

The third reason this enhancement is appropriate is that Ms. Robinson directed Housing Authority employees to sign off on fraudulent business records to conceal the scheme. Specifically, HASB employee Debbie Clark testified that she signed invoices, which Ms. Clark later learned to be fraudulent, at the direction of Ms. Robinson. (DE 331 at 19:3–8.) Other employees also testified to similar practices including Linda Stephens (DE 330 at 101:7–102:8, 102:6–20), Tim Pruitt (*Id.* at 77:6–79:12, 88:1–8), and Joanne Watford (*Id.* at 51:25–52:11). Ms. Robinson's use of her authority over subordinate employees to help conceal the scheme, making the employees functionally unwitting participants in the scheme, shows that she was taking an organizational or leadership role in the scheme.

The objection to the four-level enhancement for serving as an organizer or leader in the criminal conspiracy is accordingly overruled.

### C. Conclusion

Accordingly, the objections to the PSR are sustained in part and overruled in part. The objection to paragraphs 23, 29, and 41 regarding loss amount is sustained in part. The objection to paragraphs 30 and 42 regarding sophisticated means is sustained. The objection to paragraphs 32 and 45 regarding leadership or organizer status is overruled. The final offense level is 29.

SO ORDERED.

ENTERED: April 23, 2024

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court